

1  DANIEL G. BOGDEN
   United States Attorney
2  WAYNE D. HETTENBACH
   Senior Trial Attorney – United States Department of Justice
3  DARRIN L. MCCULLOUGH
   Trial Attorney – United States Department of Justice
4  CRANE M. POMERANTZ
   Assistant United States Attorney
5  Lloyd D. George United States Courthouse
   333 Las Vegas Boulevard South, Suite 5000
   Las Vegas, Nevada 89101
6  (702) 388-6336/Fax: (702) 388-6418

7              UNITED STATES DISTRICT COURT

8                  DISTRICT OF NEVADA

9                        -oOo-

10 UNITED STATES OF AMERICA,              )
                                          )   2:14-CR-00006-APG-GWF
11            Plaintiff,                   )
                                          )   **PLEA AGREEMENT UNDER**
12      vs.                               )   **FED. R. CRIM. P. 11(c)(1)(C)**
                                          )
13 JAMES JARIV,                           )
                                          )
14            Defendant.                   )
   _____    )

15

16      Plaintiff United States of America, by and through Daniel G. Bogden, United States

17 Attorney, Crane M. Pomerantz, Assistant United States Attorney, Wayne D. Hettenbach, Senior

18 Trial Attorney, United States Department of Justice, Environmental Crimes Section, and Darrin

19 McCullough, Trial Attorney, United States Department of Justice, Asset Forfeiture and Money

20 Laundering Section, United States Department of Justice, the Defendant, James Jariv, and the

21 Defendant's attorneys, Tim Johnson, Esq. and Greg Brower, Esq., submit this Plea Agreement under

22 Fed. R. Crim. P. 11(c)(1)(C).  Should the Court decline to follow the agreement, the Defendant

23 reserves the right to withdraw his guilty plea.

24 I.     **SCOPE OF AGREEMENT**

        The parties to this Plea Agreement are the United States of America and James Jariv ("the

                                          1

Defendant"). This Plea Agreement binds the Defendant and the United States Attorney's Office for the District of Nevada, the Environment and Natural Resources Division of the Department of Justice, and the Asset Forfeiture and Money Laundering Section of the Department of Justice. It is intended to be binding upon the Court pursuant to Fed. R. Crim. P. 11(c)(1)(C). It is also subject to and conditioned on the acceptance of the anticipated plea agreement between the Defendant and the United States by the United States District Court for the Southern District of Texas in *United States v. James Assi Jariv et al.*, Cause No. 4:12-cr-00656 (Hughes, J.) (the "Texas Action"). It does not bind any other prosecuting, administrative, or regulatory authority, or the United States Probation Office.

The Plea Agreement sets forth the parties' agreement regarding criminal charges referenced in the Plea Agreement and applicable sentences, fines, restitution and forfeiture. It does not control or prohibit the United States or any agency or third party from seeking any other civil or administrative remedies directly or indirectly against the Defendant.

## II.   DISPOSITION OF CHARGES AND WAIVER OF TRIAL RIGHTS

A.    <u>Guilty Plea</u>.  The Defendant knowingly and voluntarily agrees to plead guilty to the following counts in the Indictment:  Count One, alleging Conspiracy, in violation of Title 18, United States Code, Section 371; Count Two, alleging Conspiracy to Launder Monetary Instruments, in violation of Title 18, United States Code, Section 1956(h); Counts Three and Fifteen, alleging Wire Fraud, in violation of Title 18, United States Code, Sections 1343 and 2; and Count Fifty-Two, alleging False Statements, in violation of Title 42, United States Code, Sections 7413(c)(2)(A) and Title 18, United States Code, Section 2.

B.    <u>Waiver of Trial Rights</u>.  The Defendant acknowledges that he has been advised and understands that by entering a plea of guilty he is waiving -- that is, giving up -- certain rights

guaranteed to all defendants by the laws and the Constitution of the United States.  Specifically, the Defendant is giving up:

      1.    The right to proceed to trial by jury on all charges, or to a trial by a judge if the Defendant and the United States both agree;

      2.    The right to confront the witnesses against the Defendant at such a trial, and to cross-examine them;

      3.    The right to remain silent at such a trial, with assurance that his silence could not be used against him in any way;

      4.    The right to testify in his own defense at such a trial if he so chooses;

      5.    The right to compel witnesses to appear at such a trial and testify in the Defendant's behalf; and

      6.    The right to have the assistance of an attorney at all stages of such proceedings.

C.    <u>Withdrawal of Guilty Plea</u>.  The Defendant will not seek to withdraw his guilty plea after he has entered his plea in court unless the Court declines to accept the parties' binding agreement in this case, or the court in the Texas Action declines to accept the parties' anticipated binding agreement in that case.  If the Court rejects the Plea Agreement in this case for any reason, or the court in the Texas Action rejects the anticipated plea agreement in that case for any reason, the Defendant expressly reserves the right to withdraw his plea in both cases.

D.    <u>Additional Charges</u>.  The United States agrees not to bring any additional charges against the Defendant arising out of the investigation in the District of Nevada and elsewhere which culminated in this Plea Agreement and based on conduct known to the United States, except that the United States reserves the right to prosecute the Defendant for any crime of violence as defined by 18 U.S.C. § 16.  The United States will move at sentencing to dismiss Counts Four through

Fourteen, Sixteen through Fifty-one, and Fifty-three through Fifty-seven of the Indictment, unless the Defendant engages in conduct that could cause him to lose acceptance of responsibility, as set forth herein.

The Defendant also agrees to the forfeiture of the property set forth in this Plea Agreement, the Bill of Particulars, the Amended Bill of Particulars, and the Forfeiture Allegations of the Indictment and the District Court's imposition of the specific assets.

**III.    ELEMENTS OF THE OFFENSES**

The elements of Count One alleging Conspiracy, in violation of Title 18, United States Code, Section 371 are:

1.    There was an agreement between two or more persons to commit or attempt to commit at least one crime charged in the Indictment, in this case, wire fraud, mail fraud, Clean Air Act false statements, and obstruction of justice and to defraud the United States by obstructing the lawful functions of the Environmental Protection Agency (EPA) by deceitful or dishonest means as charged in the Indictment;

2.    The Defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

3.    One of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

9th Cir. Crim. Jury Instr. 8.20 - 21 (2010).

The elements of Count Two, alleging Conspiracy to Launder Monetary Instruments, in violation of Title 18, United States Code, Section 1956(h) are:

1.    The Defendant agreed with one or more co-conspirators to knowingly conduct a financial transaction or transactions;

2.     The transaction(s) involved funds that Defendant knew to be the proceeds of some unlawful activity;

3.     The funds were in fact the proceeds of a "specified unlawful activity," in this case, wire fraud, and

4.     The Defendant knew the transactions to be designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of such unlawful activity.

*Modeled after* 11th Cir. Crim. Jury Instr. 74.5

The elements of Counts Three and Fifteen, alleging Wire Fraud, in violation of Title 18, United States Code, Sections 1343 and 2 are:

1.     The Defendant knowingly participated in and devised a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises;

2.     The statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

3.     The Defendant acted with the intent to defraud, that is, the intent to deceive or cheat; and

4.     The Defendant used, or caused to be used, wires and electronic communications to carry out or attempt to carry out an essential part of the scheme.

9th Cir. Crim. Jury Instr. 8.121 (2010)

The elements of Count Fifty-Two, alleging False Statements, in violation of Title 42, United States Code, Sections 7413(c)(2)(A) and 2 are:

1.     The Defendant knowingly made or caused to be made a false statement, representation, or certification; and

2.     The statement, representation, or certification was made or caused to be made in a record or report required to be filed under the Clean Air Act; and

3.     The statement, representation, or certification was material.

*See United States v. Fern*, 155 F.3d 1318, 1325-26 (11th Cir. 1998).

## IV.    FACTS SUPPORTING GUILTY PLEA

A.     The Defendant will plead guilty because he is, in fact and under the law, guilty of the crimes charged.

B.     The Defendant acknowledges that if he elected to go to trial instead of pleading guilty, the United States could prove his guilt beyond a reasonable doubt. The Defendant further acknowledges that his admissions and declarations of fact set forth below satisfy every element of the charged offenses.

C.     The Defendant waives any potential future claim that the facts he admitted in this Plea Agreement were insufficient to satisfy the elements of the charged offenses.

D.     The Defendant admits and declares under penalty of perjury that the facts set forth below are true and correct:

Around September of 2009, the Defendant and Nathan Stoliar ("Stoliar") (collectively "the Defendants") bought a facility in Vancouver, Canada, named City Farm Biofuel, ("CityFarm") which was a biodiesel producing facility.  During this time, the Defendants also formed a company called Canada Feedstock Supply ("Canada Feedstock") that Alex Jariv ("A. Jariv") was to operate in order to supply feedstock[1] to CityFarm.  Stoliar was in Vancouver and oversaw the day to day operations of CityFarm from its purchase until sometime in October 2010.  For approximately the

---

[1]     Feedstock is agricultural oil or grease used in biodiesel production.

first two or three months, CityFarm produced small amounts of biodiesel that it sold in Canada, until it had exhausted the feedstock on-hand from the time of the purchase.

In early 2010, the Defendant, Stoliar, A. Jariv, and other employee managers planned a fraud scheme wherein they would claim that CityFarm was producing biodiesel, when in truth and in fact it was not. Instead, they created the documentation necessary to substantiate biodiesel production so that the Defendants, through CityFarm, Canada Feedstock, Global E Marketing ("GEM"), and other companies they controlled, could collect United States and Canadian government incentives and subsidies for biodiesel production. On or about June 23, 2009, the Defendant began registration of CityFarm with the Environmental Protection Agency ("EPA") to allow participation in government incentive and credit programs related to biodiesel production. As part of the scheme, GEM, a company controlled and operated by the Defendant, which was based in and operated out of Las Vegas, Nevada, was also later registered by the Defendant and A. Jariv to import biodiesel in order to participate in United States government incentive and credit programs related to biodiesel production.

As part of this scheme, the Defendants agreed and devised that tanker truck drivers would be instructed to drive back and forth across the U.S.-Canada border without off-loading their contents, claiming to import biodiesel into the U.S., and export feedstock to Canada Feedstock and CityFarm. These back and forth trips would generate some of the paperwork (import/export records, invoices, bills of lading, etc.) necessary to substantiate biodiesel production and import, and conceal the Defendants' fraudulent scheme. Shortly after the scheme began, the Defendants, using a company owned and controlled by the Defendant called VA&AR, purchased their own trucks and hired their own drivers to continue driving in the same type of circles, creating similar paperwork as they originally devised. The Defendants, through CityFarm, claimed to produce and import into the U.S. large amounts of biodiesel from this feedstock, when in truth and in fact CityFarm produced only

small amounts or no biodiesel, which it sold to small Canadian purchasers. CityFarm never produced any biodiesel for export to the United States. The Defendants directed their employees and agents at CityFarm, GEM, and VA&AR to execute and carry out this scheme.

The Defendants claimed to import and sell the phony CityFarm biodiesel into the United States to themselves at GEM. GEM would claim to receive the imported biodiesel and would generate records reflecting biodiesel purchases from CityFarm. GEM claimed to blend the biodiesel with petroleum diesel and sell it to third parties. In reality, some of the third parties were fictitious companies, or companies that were owned or controlled by the Defendant, and no biodiesel was blended or really sold to them. The Defendants also instructed their employees and agents to create false and fraudulent documents such as sales invoices, shipping documents, import and export records, product transfer documents, and blending tickets in order to substantiate the phony production and sales, and to conceal their scheme.

From at least August 1, 2010, and continuing through at least October 2011, at the Defendant's direction and with his knowledge, A. Jariv and others, as part of the scheme, made entries in an EPA computer system that were false and fraudulent in order to generate biodiesel credits known as RINs.[2] RINs are credits that U.S. biodiesel importers and producers can generate when they import or generate pure biodiesel, known as B-100. RINs are commodities that can be bought and sold with the biodiesel, or may be separated from the biodiesel and bought and sold on a secondary market, similar to any other commodity. Computer entries were submitted to the EPA that claimed that GEM had imported, purchased, and blended large quantities of biodiesel produced by CityFarm, when in truth and in fact the biodiesel had not been produced by CityFarm, and no biodiesel produced at CityFarm was actually transferred to and blended by GEM as these entries claimed.

---

[2] RINs is an acronym for "Renewable Identification Numbers."

From at least August 1, 2010, and continuing through at least October 2011, the Defendants, through their actions and the actions of their employees and agents, falsely claimed to import and purchase more than 4.2 million gallons of biodiesel, and generated and caused others to generate more than 6.3 million fraudulent RINs. The Defendants and their agents and employees sold the fraudulently created RINs to third-party companies, either with biodiesel or separately. The fraudulently created RINs were worth approximately $7 million. The proceeds of this scheme were used by the Defendants to further the RIN generation scheme, and the biodiesel export scheme detailed below, and the profits were divided between the Defendants.

From at least September 2009, and continuing through December 31, 2013, the Defendants also purchased in the United States large quantities of a biodiesel-petroleum blend, known as B-99, which is 99% biodiesel and 1% or less of petroleum diesel. The Defendants knew that this B-99 was RIN-less, had already been used to generate RINs by another party, and had also been used to allow another party to claim a tax credit available to those who blend B-100 into B-99. Because RIN-less B-99 cannot be used lawfully to generate a RIN, and cannot be used to claim the tax credit, it sells at a substantially lower price than B-100.

The Defendants operated and controlled a U.S. company named MJ Biofuel. The company listed a close associate of the Defendant as its owner in order to disguise its relationship with the Defendants. The Defendants used this company and the domestically purchased RIN-less B-99 to perpetrate several fraudulent schemes. In the first scheme, the Defendants would sell domestically purchased B-99, misrepresented as CityFarm-produced B-100, to third-party purchasers. By falsely changing the description of the product from B-99 to B-100, the Defendants were able to sell the biodiesel for between $2 and $2.30 more per gallon than they had bought it, because the purchaser could use B-100 to both claim the $1.00/gallon blenders tax credit, and generate RINs, and was therefore willing to pay more for B-100 than B-99. The Defendants purchased and sold

approximately 780,000 gallons of biodiesel during the time of the indictment using this scheme of relabeling domestically purchased B-99 as B-100 to sell it at a substantially higher price.

In addition, for a third-party who purchased the relabeled B-100 from the Defendants, the Defendants devised another scheme: they used another company that they controlled, ZP Chemicals, to pose as an unrelated buyer of biodiesel. ZP Chemicals then re-bought the RIN-less B-99 for a lower price from the third party than the Defendants had sold it for, after that party had taken the blenders credit and separated the RIN. The Defendants would then resell the same B-99 back to the same company through GEM or CityFarm, again claiming that it was B-100 manufactured at CityFarm, and eligible for the blenders credit and RIN generation, thereby allowing them to charge a higher price. This practice continued for several months during the period of the indictment.

Finally, from at least September 2009, through December 31, 2013, the Defendants exported RIN-less B-99 to Canada and elsewhere, without acquiring and giving RINs to the United States as they were required to do by law. U.S. biodiesel exporters must acquire and give to the EPA a number of RINs based upon the volume of biodiesel exported. This requirement necessitates that exporters charge foreign purchasers more when exporting RIN-less biodiesel to account for the RIN that the exporter must acquire and give to the EPA, and results in a higher market price for exported biodiesel because exporters and sellers must normally charge enough to offset the price of the RIN they are required to give to the EPA.

The Defendants knew that their export of biodiesel and biodiesel blends from the United States necessitated that they acquire and give RINs to the EPA after the end of each calendar year or, under certain conditions, by the end of the next calendar year. The Defendants used MJ Biofuel to purchase the RIN-less B-99 in the United States, concealing from the sellers that the Defendants were exporting the B-99. During the time covered in the indictment, the Defendants exported in excess of 23 million gallons of domestically purchased RIN-less B-99. They exported the majority

of this biodiesel to two large petroleum companies in Canada through CityFarm.[3] The Defendants did not acquire or give any RINs to the EPA as required by law for their export of biodiesel, but the market price at which they sold the biodiesel included or factored into the price the cost of the RINs that exporters were required to later give to the EPA. The Defendants instead kept the money they earned from the sale, which they otherwise would have spent acquiring RINs to give to the EPA, thereby enriching themselves and depriving the EPA of the value of these RINs. As a result of the export of more than 23 million gallons of biodiesel during the time period June 2009 through December 31 2013, the Defendants were required to provide to the United States in excess of 34 million RINs. The value of the RINs that the Defendants failed to provide to the EPA, and which they instead kept for themselves from their profits from their export and sales, was in excess of $34 million.

To carry out, facilitate, collect, and distribute the proceeds of the various schemes discussed above, the Defendants directed that money be deposited into and transferred among bank accounts in Las Vegas, Nevada, Canada, and Australia. Specifically, monies from the sale of the fraudulent RINs and from the exported B-99 were deposited into accounts controlled by the Defendant in Canada and Las Vegas, Nevada. The Defendant would direct that proceeds from these schemes be transferred from accounts in Las Vegas, Nevada, and Canada, to Stoliar's accounts in Australia. The Defendants would routinely book and describe the transactions between various companies involved in the schemes as other types of business transactions involving biodiesel, when in truth and in fact they were not. This was done in order to transfer and distribute the proceeds of the schemes under the guise of legitimate business transactions. Funds would be transferred to and from accounts controlled by the Defendant in the U.S. and Stoliar in Australia under the guise of biodiesel sales between their companies.

---

[3] The Defendants also exported some of this B-99 to Australia, Thailand, Israel, and elsewhere.

In the course of and to further the schemes described above, the Defendant did routinely and regularly from June 2009 through December 31, 2013, send and receive email messages in interstate and foreign commerce, to and from individuals located in Las Vegas, Nevada, and elsewhere, and engage in telephone conversations in interstate and foreign commerce with individuals located in Las Vegas, Nevada, and elsewhere. On or about September 13, 2010, registration documents were sent by wire via facsimile from Las Vegas, Nevada, to the EPA in Virginia, in order to further the scheme to defraud. On or about April 13, 2011, approximately $298,340.22 used to purchase biodiesel was sent by wire from Las Vegas, Nevada, to California in order to further the scheme to defraud.

The Defendant agrees that the property listed in Section X is any property, real or personal, which constitutes or is derived from proceeds traceable to violations of Title 18, United States Code, Sections 1341, 1343, 1956(a)(1)(B)(i), 1956(a)(2)(B)(i), and 1956(h), specified unlawful activities as defined in Title 18, United States Code, Sections 1956(c)(7)(A) and 1961(1)(B), or Title 18, United States Code, Sections 371 and 1956(h), conspiracy to commit such offenses; any property, real or personal, involved in violations of Title 18, United States Code, Section 1956(a)(1)(B)(i), 1956(a)(2)(B)(i), and 1956(h), or any property traceable to such property; and any property, real or personal, involved in a transaction or attempted transaction in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), 1956(a)(2)(B)(i), and 1956(h), or any property traceable to such property.

## V.        COLLATERAL USE OF FACTUAL ADMISSIONS

The facts set forth in Section IV of this Plea Agreement shall be admissible against the Defendant under Fed. R. Evid. 801(d)(2)(A) at sentencing for any purpose. If the Defendant does not plead guilty or withdraws his guilty pleas, the facts set forth in Section IV of this Plea Agreement shall be admissible at any proceeding, including a trial, for impeaching or rebutting any

12

evidence, argument or representation offered by or on the Defendant's behalf. The Defendant expressly waives all rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410 regarding the use of the facts set forth in Section IV of this Plea Agreement.

## VI.  APPLICATION OF SENTENCING GUIDELINES PROVISION:

A.   <u>Discretionary Nature of Sentencing Guidelines</u>.  The Defendant acknowledges that the Court must consider the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines") in determining the Defendant's sentence, but that the Sentencing Guidelines are advisory, not mandatory, and the Court has discretion to impose any reasonable sentence up to the maximum term of imprisonment permitted by statute.

B.   <u>Offense Level Calculations</u>.  The parties stipulate to the following calculation of the Defendant's offense level under the Sentencing Guidelines, acknowledge that these stipulations are binding upon the Court, and agree that they will not seek to apply any other specific offense characteristics, enhancements or reductions:

1.   <u>Count One</u>

| | |
|---|---|
| Base Offense Level (USSG § 2B1.1(a)(1)) | 7 |
| Enhancements: | |
| Loss Amount Exceeds $7 million (USSG § 2B1.1(b)(1)(K)) | 20 |
| Money laundering conviction (USSG § 2S1.1(b)(2)(B)) | 2 |
| Offense Committed While On Release (USSG § 3C1.3) | 3 |
| Organizer or Leader (USSG § 3B1.1(a)) | 4 |
| Adjusted Offense Level | <u>36</u> |

2.    Reductions

If applicable, a reduction for Acceptance of Responsibility
(USSG § 3E1.1) (*see subsection C. below*):                    -3

Total Offense Level:                                    <u>**33**</u>

The Defendant acknowledges that the statutory maximum sentence and any statutory

minimum sentence limit the Court's discretion in determining the Defendant's sentence

notwithstanding any applicable Sentencing Guidelines provisions.

C.    <u>Reduction of Offense Level for Acceptance of Responsibility</u>.    Under USSG §

3E1.1(a), the United States will recommend that the Defendant receive a two-level downward

adjustment for acceptance of responsibility unless he: (a) fails to truthfully admit facts establishing a

factual basis for the guilty plea when he enters the plea; (b) fails to truthfully admit facts establishing

the amount of restitution owed when he enters his guilty plea; (c) fails to truthfully admit facts

establishing the forfeiture allegations when he enters his guilty plea; (d) provides false or misleading

information to the United States, the Court, Pretrial Services, or the Probation Office; (e) denies

involvement in the offense or provides conflicting statements regarding his involvement or falsely

denies or frivolously contests conduct relevant to the offense; (f) attempts to withdraw his guilty

plea; (g) commits or attempts to commit any crime; (h) fails to appear in court; or (i) violates the

conditions of pretrial release.

Under USSG § 3E1.1(b), the United States will move for an additional one-level downward

adjustment for acceptance of responsibility before sentencing because the Defendant communicated

his decision to plead guilty in a timely manner that enabled the United States to avoid preparing for

trial and to efficiently allocate its resources.

14

These Sentencing Guidelines provisions, if applied, will result in a total offense level of either 34 (if two-level adjustment applies) or 33 (if two-level adjustment and additional one-level adjustment both apply).

The parties agree that regardless of the guideline range corresponding to the total offense level, a term of ten years' imprisonment is a fair and appropriate sentence when considering the factors set forth in 18 U.S.C. § 3553 and the parties' exchange of mutual benefits and concessions. The parties agree that if the Court rejects the binding plea and the Defendant is not sentenced to a ten year term, either party may withdraw from the agreement.

D.    Criminal History Category.    The Defendant acknowledges that the Court may base his sentence in part on the Defendant's criminal record or criminal history.    The Court will determine the Defendant's Criminal History Category under the Sentencing Guidelines.

E.    Relevant Conduct.    The Court may consider any counts dismissed under this Plea Agreement and all other relevant conduct, whether charged or uncharged, in determining the applicable Sentencing Guidelines range and whether to depart from that range.

F.    Additional Sentencing Information.

The stipulated Sentencing Guidelines calculations are based on information now known to the parties.    The parties may provide additional information to the United States Probation Office and the Court regarding the nature, scope, and extent of the Defendant's criminal conduct and any aggravating or mitigating facts or circumstances.

Good faith efforts to provide truthful information or to correct factual misstatements shall not be grounds for the Defendant to withdraw his guilty plea.

The Defendant acknowledges that the United States Probation Office may calculate the Sentencing Guidelines differently and may rely on additional information it obtains through its investigation.    The Defendant also acknowledges that the Court may rely on this and other additional

1 information as it calculates the Sentencing Guidelines range and makes other sentencing

2 determinations, and the Court's reliance on such information shall not be grounds for the Defendant

3 to withdraw his guilty plea.

4 **VII.    APPLICATION OF SENTENCING STATUTES**

5        A.    <u>Maximum Penalty</u>.  The maximum penalty for violating Title 18, United States Code,

6 Section 371, Conspiracy, is not more than five (5) years' imprisonment, a fine of not more than two

7 hundred fifty thousand dollars ($250,000), or both.  In addition, the Defendant is subject to

8 supervised release for a term not exceeding three (3) years.

9        The maximum penalty for violating Title 18, United States Code, Section 1956(h),

10 Conspiracy to Launder Monetary Instruments, is not more than twenty (20) years' imprisonment, a

11 fine of not more than five hundred thousand dollars ($500,000) or twice the value of the property

12 involved in the transaction, or both imprisonment and a fine.  In addition, the Defendant is subject to

13 supervised release for a term not exceeding three (3) years.

14        The maximum penalty for violating Title 18, United States Code, Section 1343, Wire Fraud,

15 is not more than twenty (20) years' imprisonment, a fine of not more than two hundred fifty

16 thousand dollars ($250,000), or both.  In addition, the Defendant is subject to supervised release for

17 a term not exceeding three (3) years.

18        The maximum penalty for violating Title 42, United States Code, Section 7413(c)(2)(A),

19 False Statements (Clean Air Act), is not more than two (2) years' imprisonment, a fine of not more

20 than two hundred fifty thousand dollars ($250,000), or both.  In addition, the Defendant is subject to

21 supervised release for a term not exceeding one (1) year.

22        B.    <u>Factors Under 18 U.S.C. § 3553</u>.  The Court must consider the factors set forth in 18

23 U.S.C. § 3553(a) in determining the Defendant's sentence.  However, the statutory maximum

24

sentence and any statutory minimum sentence limit the Court's discretion in determining the Defendant's sentence.

C.    Parole Abolished.    The Defendant acknowledges that his prison sentence cannot be shortened by early release on parole because parole has been abolished.

D.    Supervised Release.    In addition to imprisonment and a fine, the Defendant will be subject to a term of supervised release not to exceed three years.  18 U.S.C. § 3583(b).  Supervised release is a period of time after release from prison during which the Defendant will be subject to various restrictions and requirements.  If the Defendant violates any condition of supervised release, the Court may order the Defendant's return to prison for all or part of the term of supervised release, which could result in the Defendant serving a total term of imprisonment greater than the statutory maximum prison sentence of twenty (20) years.

E.    Special Assessment.    The Defendant will pay a $100.00 special assessment per count of conviction at the time of sentencing for a total of $500.00.

F.    Fines.    The Defendant agrees that the Court may impose a fine due and payable immediately upon sentencing.

G.    Restitution.    The Defendant agrees to make restitution in an amount to be determined by the Court at sentencing.  In return for the Defendant agreeing to make restitution for relevant conduct, the United States agrees not to bring charges against the Defendant for the conduct giving rise to the restitution amount.  The Defendant understands that any restitution imposed by the Court may not be discharged in whole or in part in any present or future bankruptcy proceeding.

## VIII.    POSITIONS REGARDING SENTENCE

The United States will recommend that the Court sentence the Defendant to ten years' imprisonment, a fine and restitution amount to be determined by the Court at sentencing, and, as set forth in this Plea Agreement, the terms of supervised release, a special assessment, and forfeiture of

the identified assets, unless the Defendant commits any act that could cause him to lose acceptance of responsibility. The Defendant acknowledges that neither the Court in this case nor the court in the Texas Action is required to follow the United States' recommendation, in which case either party may withdraw from this Plea Agreement. This Plea Agreement does not require the United States to file any pre- or post-sentence downward departure motion under USSG § 5K1.1 or Fed. R. Crim. P. 35. The United States reserves its right to defend any lawfully imposed sentence on appeal or in any post-conviction litigation.

The Defendant will not request a period of incarceration below the agreed upon term of ten years, will not seek a downward adjustment pursuant to 18 U.S.C. § 3553 or USSG § 4A1.3(b)(1) from any sentence the Court may impose, and will not seek to reduce or change the assets agreed to be forfeited. The Defendant acknowledges that the parties are free to argue for any fine amount consistent with the maximum penalties, and free to argue for any amounts in restitution.

## IX.    FINANCIAL INFORMATION AND DISPOSITION OF ASSETS

Before or after sentencing, upon request by the Court, the United States, or the Probation Office, the Defendant will provide accurate and complete financial information, submit sworn statements, and/or give depositions under oath concerning his assets and his ability to pay. The Defendant will surrender assets he obtained directly or indirectly as a result of his crimes, and will release funds and property under his control in order to pay any fine, forfeiture, or restitution ordered by the Court.

## X.    FORFEITURE

The defendant knowingly and voluntarily:

A.    Agrees to the District Court imposing the civil judicial forfeiture or the criminal forfeiture of:

///

1.  $50,000 in lieu of the 2013 Infiniti QX56 bearing Nevada license Plate 644 WTT, VIN JN8AZ2NE5D9040252, registered to In Choi Belding;

2.  2011 Infiniti QX56 bearing Nevada license Plate 785 XMK, VIN JN8AZ2NF0B9502173, registered to Jiwon Jariv and James Jariv;

3.  REAL PROPERTY LOCATED AT 2289 BUCKINGHAM COURT, HENDERSON, NEVADA 89074, MORE PARTICULARLY DESCRIBED AS:

    PARCEL I:

    LOT SEVENTY-NINE (79) AND EIGHTY (80) IN BLOCK THREE (3) OF THE FOUNTAINS UNIT NO. 2, AS SHOWN BY MAP THEREOF ON FILE IN BOOK 41 OF PLATS, PAGE 49, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.

    PARCEL II:

    A NON-EXCLUSIVE EASEMENT FOR THE BENEFIT OF AND APPURTENANT TO PARCEL ONE (1) ABOVE DESCRIBED FOR INGRESS AND EGRESS OVER ALL STREETS AND ROADWAYS AS SHOWN BY MAP OF THE FOUNTAINS UNIT NO. 2, ON FILE IN BOOK 41 OF PLATS, PAGE 49 IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA, WHICH HAVE NOT BEEN DEDICATED TO AND ACCEPTED FOR PUBLIC USE AND OWNERSHIP BY THE CITY OF HENDERSON, TOGETHER WITH ALL IMPROVEMENTS AND APPURTENANCES THEREON, APN: 178-07-711-046;

4.  $47,672.40 IN UNITED STATES CURRENCY IN LIEU OF REAL PROPERTY LOCATED AT 2854 GEARY PLACE UNIT 3802, LAS VEGAS, NEVADA 89109, MORE PARTICULARLY DESCRIBED AS:

    PARCEL I:

UNIT NO. 3802 IN BUILDING 38 OF VILLAGE GREEN CONDOMINIUMS, A

COMMON INTEREST CONDOMINIUM DEVELOPMENT, AS SHOWN BY MAP

THEREOF ON FILE IN BOOK 121, OF PLATS, PAGE 60, IN THE OFFICE OF

THE COUNTY RECORDER, CLARK COUNTY, NEVADA AND AMENDED BY

THAT CERTAIN CERTIFICATE OF AMENDMENT RECORDED MAY 5, 2005 AS

INSTRUMENT NO. 00763 IN BOOK 20050505 OF OFFICIAL RECORDS.

PARCEL II:

ONE (1) ALLOCATED INTEREST AS TENANTS-IN-COMMON IN AND TO THE

COMMON AREA OF EACH PHASE OF VILLAGE GREEN CONDOMINIUMS, A

COMMON INTEREST CONDOMINIUM DEVELOPMENT, AS SHOWN BY MAP

THEREOF ON FILE IN BOOK 121 OF PLATS, PAGE 60 IN THE OFFICE OF THE

COUNTY RECORDER OF CLARK COUNTY, NEVADA AND AMENDED BY A

CERTIFICATE OF AMENDMENT RECORDED MAY 5, 2005 IN BOOK 20050505

AS DOCUMENT NO. 00763, OFFICIAL RECORDS. SAID ALLOCATED

INTEREST TO BE A FRACTION THE NUMERATOR OF WHICH SHALL BE

ONE (1), AND THE DENOMINATOR WHICH SHALL BE THE NUMBER OF

UNITS IN THE COMMUNITY WHICH SHALL BECOME SUBJECT TO THE

DECLARATION OF RESTRICTIONS RECORDED FEBRUARY 4, 2005 IN BOOK

20050204 AS DOCUMENT NO. 3560, OFFICIAL RECORDS.

EXCEPTING THEREFROM ALL UNITS AND BUILDINGS LOCATED WITHIN

THE ABOVE REFERENCED PLAT.

RESERVING THEREFROM THE RIGHT TO POSSESSION OF ALL THOSE

AREAS DELINEATED AS "COMMON ELEMENTS" UPON VILLAGE GREEN

CONDOMINIUMS, A COMMON INTEREST CONDOMINIUM DEVELOPMENT

AS DEFINED IN THE DECLARATION. FURTHER RESERVING THEREFROM

FOR THE BENEFIT OF THE OWNERS OF ALL UNITS WITHIN VILLAGE

GREEN CONDOMINIUMS, A COMMON INTEREST CONDOMINIUM

DEVELOPMENT, (EXCEPT THE UNIT REFERRED TO IN PARCEL I, HEREIN)

NON-EXCLUSIVE EASEMENTS FOR INGRESS, EGRESS, USE AND

ENJOYMENT OF, ON, OVER AND ACROSS THE COMMON ELEMENTS, AS

PROVIDED FOR IN AND SUBJECT TO THE DECLARATION.

PARCEL III:

THE EXCLUSIVE RIGHT OF USE, POSSESSION AND OCCUPANCY OF THOSE

PORTIONS THE PROJECT DESIGNATED AS "COMMON ELEMENTS" (AS

DEFINED IN AND SUBJECT TO THE DECLARATION), WHICH ARE

APPURTENANT TO PARCELS I AND II DESCRIBED ABOVE.

PARCEL IV:

NON-EXCLUSIVE EASEMENTS OF ACCESS, INGRESS AND EGRESS, USE

AND ENJOYMENT OF, IN AND TO THE COMMON ELEMENTS, ONLY AS TO

THOSE PORTIONS OF THE COMMON ELEMENTS WHICH LAY IN THE

UNENCLOSED PORTIONS OF UNITS AS SET FORTH IN THE DECLARATION

OF COVENANTS, CONDITIONS AND RESTRICTIONS AND GRANT AND

RESERVATION OF

EASEMENTS RECORDED FEBRUARY 4, 2005 IN BOOK 20050204 AS

INSTRUMENT NO. 03560 OFFICIAL RECORDS.

PARCEL V:

ALL OF THE PRIVATE STREETS KNOWN AS OAKMONT AVENUE,

OAKMONT DRIVE AND OAKMONT PLACE ADJOINING THE LOTS

DESCRIBED IN PARCEL I ABOVE, AND AS SHOWN ON SAID MAP OF LAS

VEGAS INTERNATIONAL COUNTRY CLUB ESTATES IN BOOK 10 OF PLATS,

PAGE 87, IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY,

NEVADA.

PARCEL IV:

AN EASEMENT FOR INGRESS AND EGRESS TO AND FROM PARCELS I AND

II OVER VEGAS VALLEY DRIVE, AS SHOWN ON THE MAP OF LAS VEGAS

INTERNATIONAL COUNTRY CLUB ESTATES, AS PROVIDED FOR IN THAT

CERTAIN DECLARATION OF RESTRICTIONS RECORDED APRIL 7, 1969 IN

BOOK 941 AS INSTRUMENT NO. 755358 IN THE OFFICE OF THE COUNTY

RECORDER, CLARK COUNTY, NEVADA, TOGETHER WITH ALL

IMPROVEMENTS AND APPURTENANCES THEREON, APN: 162-10-212-495;

5.    REAL PROPERTY LOCATED AT 820 VEGAS VALLEY DRIVE, LAS VEGAS,

NEVADA 89109, MORE PARTICULARLY DESCRIBED AS:

PARCEL ONE (1):

LOT 34 OF LAS VEGAS INTERNATIONAL COUNTRY CLUB PATIO HOUSE

UNIT NO. 7, AS SHOWN BY MAP THEREOF ON FILE IN BOOK 15 OF PLATS,

PAGE 62, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY

NEVADA.

PARCEL TWO (2):

A PORTION OF SECTION 10, TOWNSHIP 21 SOUTH, RANGE 61 EAST M.D.B.

AND M. CLARK COUNTY, NEVADA; AN ADDITION TO LOT 34 OF THE LAS

VEGAS INTERNATIONAL COUNTRY CLUB PATION HOUSES UNIT NO. 7, AS

///

RECORDED IN BOOK 15 OF PLATS, PAGE 62, CLARK COUNTY, NEVADA
RECORDERS.

COMMENCING AT THE NORTHEAST CORNER OF LOT 34, BEING THE TRUE
POINT OF BEGINNING; THENCE NORTH 05 DEGREES 45 MINUTES 10
SECONDS EAST A DISTANCE OF 6.40 FEET TO A POINT; THENCE NORTH 77
DEGREES 29 MINUTES 19 SECONDS WEST A DISTANCE OF 34.39 FEET TO A
POINT; THENCE SOUTH 12 DEGREES 30 MINUTES 41 SECONDS WEST A
DISTANCE OF 6.00 FEET TO A POINT; THENCE SOUTH 77 DEGREES 29
MINUTES 19 SECONDS EAST A DISTANCE OF 35.10 FEET TO THE TRUE
POINT OF BEGINNING, TOGETHER WITH ALL IMPROVEMENTS AND
APPURTENANCES THEREON, APN: 162-10-612-009;

6.   REAL PROPERTY LOCATED AT 19645 ROSITA STREET, TARZANA,
CALIFORNIA 91356, AND MORE PARTICULARLY DESCRIBED AS: THAT
PORTION OF LOT 79, OF TRACT NO. 2605, IN THE CITY OF LOS ANGELES,
COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP
RECORDED IN BOOK 27 PAGE(S) 55 TO 75 INCLUSIVE OF MAPS, IN THE
OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

BEGINNING AT A POINT IN THAT CERTAIN COURSE IN THE
SOUTHWESTERLY LINE OF SAID LOT 79 SHOWN ON SAID MAP OF TRACT
2605 AS HAVING A BEARING NORTH 66° 53′ WEST AND A LENGTH OF
499.65 FEET, DISTANT THEREON NORTH 65° 53′ 00″ WEST 361.43 FEET
FROM THE SOUTHEASTERLY TERMINUS THEREOF, THENCE ALONG SAID
SOUTHWESTERLY LINE SOUTH 66° 53′ 00″ EAST 149.26 FEET, THENCE
NORTH 35° 01′ 33″ EAST 201.13 FEET, THENCE NORTH 77° 00′ 45″ EAST 15.00

23

FEET TO THE NORTHEASTERLY LINE OF THE LAND DESCRIBED IN

PARCEL 1 IN THE DEED TO WILLIAM J. DEVINE, RECORDED APRIL 9, 1947

AS INSTRUMENT NO. 179, IN BOOK 24453, PAGE 255 OF OFFICIAL

RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY,

THENCE ALONG SAID NORTHEASTERLY LINE NORTH 12° 59′ 15″ WEST

50.00 FEET, THENCE NORTHWESTERLY ALONG A TANGENT CURVE

CONCAVE SOUTHWESTERLY HAVING A RADIUS OF 113.52 FEET, A

DISTANCE OF 94.19 FEET, THENCE TANGENT TO SAID CURVE, NORTH 60°

31′ 45″ WEST 30.29 FEET, THENCE SOUTH 29° 28′ 15″ WEST 15.00 FEET,

THENCE SOUTH 40° 47′ 58″ WEST 128.20 FEET TO THE SOUTHEASTERLY

LINE OF THE LAND DESCRIBED IN THE DEED TO MILDRED V. DEVINE,

RECORDED OCTOBER 22, 1952 AS INSTRUMENT NO: 3442, IN BOOK 40135,

PAGE 307 OF OFFICIAL RECORDS, THENCE ALONG SAID SOUTHEASTERLY

LINE, SOUTH 31° 35′ 08″ WEST 35.00 FEET TO THE TRUE POINT OF

BEGINNING, SAID TRUE POINT OF BEGINNING ALSO BEING THE

WESTERLY CORNER OF THE LAND DESCRIBED IN PARCEL 1 IN THE DEED

TO WILLIAM H. BALL, JR. AND WIFE RECORDED MARCH 18, 1959 AS

INSTRUMENT NO. 2214, IN BOOK D402, PAGE 332 OF OFFICIAL RECORDS,

THENCE ALONG THE WESTERLY BOUNDARY LINES OF SAID PARCEL 1 OF

THE LAND BALL, JR. AND WIFE AS FOLLOWS SOUTH 59° 07′ 30″ EAST

143.93 FEET TO AN ANGLE POINT THEREIN, AND SOUTH 35° 01′ 35″ WEST

106.50 FEET TO SAID SOUTHWESTERLY LINE OF LOT 79, THENCE ALONG

SAID SOUTHWESTERLY LINE, NORTH 66° 53′ 00″ WEST 145.86 FEET;

THENCE NORTH 31° 35′ 08″ EAST 125.92 FEET TO A LINE THAT BEARS

SOUTH 59° 07′ 30″ EAST AND WHICH PASSES THROUGH THE TRUE POINT OF BEGINNING; THENCE ALONG SAID LAST MENTIONED LINE, SOUTH 59° 07′ 30″ EAST 6.75 FEET TO THE TRUE POINT OF BEGINNING,

TOGETHER WITH ALL IMPROVEMENTS AND APPURTENCES THEREON, APN: 2175-013-011;

7. $224,128.44 in United States Currency, seized from Citibank #XXXXX7496;

8. $24,929.91 in United States Currency, seized from Citibank #XXXXX3355;

9. $20,054.20 in United States Currency, seized from Citibank #XXXXX3363;

10. $86,998.40 in United States Currency, seized from Mountain America Credit Union ("MACU") #XXX7251;

11. $15,076.92 in United States Currency, seized from MACU #XXX9831;

12. $41,828.53 in United States Currency, seized from MACU #XXX2703;

13. $115,964.46 in United States Currency, seized from MACU #XXX6537;

14. $134,722.29 in United States Currency, seized from MACU #XXX7452;

15. $22,347.20 in United States Currency, seized from MACU #XXX5447;

16. $207,830.06 in United States Currency, seized from Charles Schwab #XXXX- 0164;

17. $50,556.65 in United States Currency, seized from Bank of America #XXXXXXXX9158;

18. $43,154.28 in United States Currency, seized from Wells Fargo #XXXXXX1496;

19. $86,773.95 in United States Currency, seized from Wells Fargo #XXXXXX7675;

20. $900.00 in United States Currency;

21. gold Bulgari chronograph, on synthetic strap;

22. a diamond tennis bracelet, approximately six inches long;

///

23. a white metal necklace, approximately sixteen inches long, with small diamonds in a circular pattern;

24. a white metal necklace, approximately sixteen inches long, with a reddish-orange pendant;

25. any and all debt between JARIV Companies including Evergreen Asset Trust, GEG Capital, and TKJ Corp., and Angel Toledo, loan number 18898-0, in the amount of $19,978.41 and any payments due, principal due or interest accrued on the debt, located at Weststar Mortgage Corporation, dba Weststar Loan Servicing Corp., 2340 Paseo Del Prado, Suite D 104, Las Vegas, Nevada 89102;

26. any and all debt between JARIV Companies including Evergreen Asset Trust, GEG Capital, and TKJ Corp., and Elizabeth Canalas, loan number 19266-0, in the amount of $126,000 and any payments due, principal due or interest accrued on the debt, located at Weststar Mortgage Corporation, dba Weststar Loan Servicing Corp., 2340 Paseo Del Prado, Suite D 104, Las Vegas, Nevada 89102;

27. any and all debt between JARIV Companies including Evergreen Asset Trust, GEG Capital, and TKJ Corp., and Jesus Rivera Espinoza, loan number 19244-0, in the amount of $42,000.00 and any payments due, principal due or interest accrued on the debt, located at Weststar Mortgage Corporation, dba Weststar Loan Servicing Corp., 2340 Paseo Del Prado, Suite D 104, Las Vegas, Nevada 89102;

28. $23,396.26 in lieu of all debt between JARIV Companies including Evergreen Asset Trust, GEG Capital, and TKJ Corp., and Jesus Rivera Espinoza, loan number 19255-0, in the amount of $22,911.43 and any payments due, principal due or interest accrued on the debt, located at Weststar Mortgage Corporation, dba Weststar Loan Servicing Corp., 2340 Paseo Del Prado, Suite D 104, Las Vegas, Nevada 89102;

29. $80,506.67 in lieu of all debt between JARIV Companies including Evergreen Asset Trust, GEG Capital, and TKJ Corp., and KOI Investments, Inc., Keith and Beth Oliver, loan number 19366-0, in the amount of $80,000 and any payments due, principal due or interest accrued on the debt, located at Weststar Mortgage Corporation, dba Weststar Loan Servicing Corp., 2340 Paseo Del Prado, Suite D 104, Las Vegas, Nevada 89102;

30. any and all debt between JARIV Companies including Evergreen Asset Trust, GEG Capital, and TKJ Corp., and Landmax Properties, LLC, Olukayode Adewole, loan number 19365-0, in the amount of $21,500 and any payments due, principal due or interest accrued on the debt, located at Weststar Mortgage Corporation, dba Weststar Loan Servicing Corp., 2340 Paseo Del Prado, Suite D 104, Las Vegas, Nevada 89102;

31. any and all debt between JARIV Companies including Evergreen Asset Trust, GEG Capital, and TKJ Corp., and Minerva Y. Lugo, loan number 19241-0, in the amount of $49,999.32 and any payments due, principal due or interest accrued on the debt, located at Weststar Mortgage Corporation, dba Weststar Loan Servicing Corp., 2340 Paseo Del Prado, Suite D 104, Las Vegas, Nevada 89102;

32. any and all debt between JARIV Companies including Evergreen Asset Trust, GEG Capital, and TKJ Corp., and Jesus Adan Felix Rodriguez, loan number 18577-0, in the amount of $24,959.09 and any payments due, principal due or interest accrued on the debt, located at Weststar Mortgage Corporation, dba Weststar Loan Servicing Corp., 2340 Paseo Del Prado, Suite D 104, Las Vegas, Nevada 89102;

33. any and all funds in Bank of Montreal account #XXX2936, in the name of City Farm Biofuel Ltd.;

34. any and all funds in Bank of Montreal account #XXX5322, in the name of City Farm Biofuel Ltd.;

35. any and all funds in Bank of Montreal account #XXXXXXX1226, account name unknown;

36. any and all funds in Bank of Montreal account #XXX1242, account name uncertain, possibly in the name of 0858487 BC Ltd.;

37. any and all funds in Bank of Montreal account #XXX9053, account name uncertain, possibly in the name of 0858487 BC Ltd.;

38. $942,016 in United States Currency; and

39. $23,437.33 in United States Currency

(all of which constitutes "property").

B. Agrees to the criminal forfeiture, the abandonment, the civil forfeiture, or the civil administrative forfeiture of the property;

C. Abandons or forfeits the property to the United States;

D. Relinquishes all right, title, and interest in the property;

E. Waives his right to any abandonment proceedings, any civil administrative forfeiture proceedings, any civil judicial forfeiture proceedings, or any criminal forfeiture proceedings of the property ("proceedings");

F. Waives service of process of any and all documents filed in this action or any proceedings concerning the property arising from the facts and circumstances of this case;

G. Waives any further notice to him, his agents, or his attorney regarding the abandonment or the forfeiture and disposition of the property;

H. Agrees not to file any claim, answer, petition, or other documents in any proceedings concerning the property;

///

28

I.   Waives the statute of limitations, the CAFRA requirements, Fed. R. Crim. P. 7, 11, and 32.2, all constitutional requirements, including but not limited to, the constitutional due process requirements of any proceedings concerning the property;

J.   Waives his right to a jury trial on the forfeiture of the property;

K.   Waives all constitutional, legal, and equitable defenses to the forfeiture or abandonment of the property in any proceedings, including but not limited to (1) constitutional or statutory double jeopardy defenses and (2) defenses under the Excessive Fines or Cruel and Unusual Punishments Clauses of the Eighth Amendment to the United States Constitution;

L.   Waives the right to appeal any Order of Forfeiture;

M.   Agrees to the entry of an Order of Forfeiture of the property to the United States;

N.   Agrees the property is forfeited to the United States;

O.   Agrees and understands the abandonment, the civil administrative forfeiture, the civil judicial forfeiture, or the criminal forfeiture of the property shall not be treated as satisfaction of any assessment, fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to the abandonment or the forfeiture;

P.   Acknowledges that the amount of the forfeiture may differ from, and may be significantly greater than or less than, the amount of restitution; and

Q.   Agrees to take all steps as requested by the United States to pass clear title of the property to the United States and to testify truthfully in any judicial forfeiture proceedings. The defendant understands and agrees that the property represents proceeds and/or facilitating property of illegal conduct and is forfeitable. The defendant acknowledges that failing to

cooperate in full in the forfeiture of the property constitutes a breach of this Plea Agreement.

## XI.    THE DEFENDANT'S ACKNOWLEDGMENTS AND WAIVERS

A.    Plea Agreement and Decision to Plead Guilty.  The Defendant acknowledges that:

(1)    He has read this Plea Agreement and understands its terms and conditions;

(2)    He has had adequate time to discuss this case, the evidence, and this Plea Agreement with his attorney;

(3)    He has discussed the terms of this Plea Agreement with his attorney;

(4)    The representations contained in this Plea Agreement are true and correct, including the facts set forth in Section IV; and

(5)    He was not under the influence of any alcohol, drug, or medicine that would impair his ability to understand the Agreement when he considered signing this Plea Agreement and when he signed it.

The Defendant understands that he alone decides whether to plead guilty or go to trial, and acknowledges that he has decided to enter his guilty plea knowing of the charges brought against him, his possible defenses, and the benefits and possible detriments of proceeding to trial.  The Defendant also acknowledges that he decided to plead guilty voluntarily and that no one coerced or threatened him to enter into this Plea Agreement.

B.    Waiver of Appeal and Post-Conviction Proceedings.  The Defendant knowingly and expressly waives: (a) the right to appeal any sentence imposed within or below the applicable Sentencing Guideline range as determined by the Court; (b) the right to appeal the manner in which the Court determined that sentence on the grounds set forth in 18 U.S.C. § 3742; and (c) the right to appeal any other aspect of the conviction or sentence and any order of restitution or forfeiture.

The Defendant also knowingly and expressly waives all collateral challenges, including any claims under 28 U.S.C. § 2255, to his conviction, sentence, and the procedure by which the Court adjudicated guilt and imposed sentence, except non-waivable claims of ineffective assistance of counsel.

The Defendant reserves only the right to appeal any portion of the sentence that is an upward departure from the Sentencing Guidelines range determined by the Court.

The Defendant acknowledges that the United States is not obligated or required to preserve any evidence obtained in the investigation of this case.

C.    Removal/Deportation Consequences.  The Defendant understands and acknowledges that if he is not a United States citizen, then it is highly probable that he will be permanently removed (deported) from the United States as a consequence of pleading guilty under the terms of this Plea Agreement.   The Defendant has also been advised if his conviction is for an offense described in 8 U.S.C. § 1101(a)(43), he will be deported and removed from the United States and will not be allowed to return to the United States at any time in the future.  The Defendant desires to plead guilty regardless of any immigration consequences that may result from his guilty plea, even if the consequence is automatic removal from the United States with no possibility of returning. The Defendant acknowledges that he has specifically discussed these removal/deportation consequences with his attorney.

## XI.    ADDITIONAL ACKNOWLEDGMENTS

This Plea Agreement resulted from an arms-length negotiation in which both parties bargained for and received valuable benefits in exchange for valuable concessions.  It constitutes the entire agreement negotiated and agreed to by the parties.  No  promises, agreements or conditions other than those set forth in this agreement have been made or implied by the Defendant, the Defendant's attorney, or the United States, and no additional promises, agreements or conditions

31

1  shall have any force or effect unless set forth in writing and signed by all parties or confirmed on the

2  record before the Court.

3                                                    DANIEL G. BOGDEN,
                                                     United States Attorney

4
5  DATE _4/28/15_
                                                     WAYNE D. HETTENBACH
6                                                    Senior Trial Attorney
                                                     DARRIN L. MCCULLOUGH
7                                                    Trial Attorney
                                                     CRANE M. POMERANTZ
8                                                    Assistant United States Attorney

9  DATE _4-28-15_
                                                     TIM JOHNSON
10                                                   GREG BROWER
11                                                   Counsel for the Defendant

12  DATE _4/3/15_
                                                     JAMES JARIV
13                                                   Defendant
14
                                                                    4/28/15
15
16
17
18
19
20
21
22
23
24

                                        32